Allen, Jr. v. Entergy Louisiana, L. Allen, Jr. v. Entergy Louisiana, L. Allen, Jr. v. Entergy Louisiana, L. Allen, Jr. v. Entergy Louisiana, L. . Okay. Mr. Cater. We're going to go ahead and start with the questions.  about the workweek and bonus offset. The main question is whether this is a fluctuating workweek, isn't it? It is. It's not the only question, but it's the main one. It's a main question, and it's a little unique in that the cases that the court has considered in the past haven't really dealt with. This is basically a two-week schedule. It's a two-week schedule, and it's a fixed schedule, and it's a one-week schedule. One question is whether that constitutes fluctuating when it's a fixed schedule that they can look at and know for the whole year when they're going to be working. It's either a fixed biweekly schedule, or it's a fluctuating one-week schedule, isn't it? Either way. I mean, that's the way you... But, I mean, those are different. I mean, that's an either-or. No, that's a question for the court to determine. I mean, the plaintiff's understanding was clearly that they were to work a 36-hour one-week and 48-hours the next week, and Mr. Luke explained it very well when they asked, well, you understood that you were going to be working more than 40 hours one-week and less than 40 the next, and, of course, he  We don't have any... We don't have any disputed facts, do we? These are purely questions of law on summary judgment. On that point, however, I would agree with that, but for the... Scott Anders was the security manager, and he's the person who offered the job on behalf of Energy. And it does create an issue there. And let me give you the background. Energy, until 2009, June of 2009, Energy had contracted out for their security services, and around... In early 2009, the Waterford III, which was regulated by the NRC, had failed a force-on-force drill, which basically My understanding is simply that it resulted in their... They had to fix it right now. And another incident had occurred at another facility with the Wackenhut contractor, which led Energy to make the decision to bring the security force into their internal operations, make them employees. And I give you that history because Mr. Anders was tasked with figuring out their salary, and the determination was that they were going to be salaried, whereas historically, and some of the people who worked there for over 20 years, the plaintiffs had been hourly. So their history is for hourly pay. So what Mr. Anders did, he knew that based on the force-on-force drill, that there was going to be a lot of required overtime of these people. He also knew that the NRC was going to implement fatigue rules beginning around October. This is in 2009. So, and we're talking about in the spring of 2009. So he and the human resources person for Energy developed a method of calculating a salary. And what they did was, and he clearly testified to this, he took their hourly pay, and then he looked at the fatigue rules, which required that absent waivers, they could work the employees 72 hours in a week. And then he added into that the bonus that they would be getting as salaried employees, which he told them would be approximately 15, he had never seen it be less than 15 percent. So that background is kind of necessary, because here's what he did when he offered him the job. He knows how he's calculated their salary based on their hourly pay. He knows how he's calculated their salary based on that fatigue rule, because he knows there's going to be a lot of upcoming additional work time required. And the fatigue rules were going to be implemented in October. He didn't expect, according to his testimony, that they would be able to remain within even the fatigue rules until about October, meaning that they would be able to continue to work the employees 72 hours a week. But these folks were hourly people. So when they came to him and asked him, how does my pay translate to hourly, he testified that he took 40 hours a week, multiplied it by 52, came up with 2,080,  and that's what he gave them as an hourly rate. And so that's what they believed to be the case. But that doesn't comport with how he had calculated their salary, knowing that they were going to be at least two and probably for a while at least in violation of what would ultimately become the fatigue rules, meaning he's telling them to work based on a 40-hour week, but he had calculated it based on more than or at least a 72-hour week. And so with that, and to further complicate things, when Energy sends them their checks, their check stub shows an hourly rate. So I don't know if that answers your question, but that to me creates an issue of fact beyond what we were talking about would be agreed upon. I have a few facts about that if you're done answering the question. On what you just said about the hourly rate, if you use that hourly rate with the hours that you all have argued should have been paid, and you apply the time and a half overtime and all of that, what is that dollar compared to the calculation that was done for purposes of this dismissal? How do those numbers, I'm just having trouble with the math. How does the math compare? I don't think we've done that math yet. Okay, so we don't know. We don't know if that changes the outcome or not. I don't know. Okay. Then my other question is this. But I can't, I can't, here's a comparison. Well, the employees are paid more or less depending on which one of these theories you go by. I'm sorry? You calculate it one way and the company pays less money than the other way. I mean, we're going through the math. The end result is that you pay them less money than they think they're entitled to. Right. I mean, that's what we're talking about. They say you want more money. I mean, according to his calculation, by using the key rule. The question she's asking directly is how much do these people do if they're right? It's a little different question than that. The question is not what your employees, your clients think they should have been paid, but rather what this number is that you're now arguing that the company calculated as an hourly rate that was represented to them. What would happen if you would use that as a static rate, not this dynamic fluctuating thing, but a static rate multiplying all hours up to 40 a week at the rate and then time and half for the overtime. What was that number be? That was my question. And you said, I thought that you didn't know. I don't know. Then my next question is this June 4, 2009 letter that was signed by about 20 people. Including Nathan Hills. Yes, that was my question. Was it only Nathan Hills and Luke did not sign it? He was not at that time. He was. I'm sorry I didn't give you that background. He was a security officer and later came on. Okay. So he did not sign the letter. Was he aware of the letter? Is there evidence that he was aware of the letter? There's been no showing of that. Okay. So, but Hill signed the letter. How do you get around what's in the letter? I mean, even putting aside the issue that Judge Smith raised about the fluctuating week being 36 to 48, even if we accept that that's not a fluctuating week. This letter shows that they knew when they started that they were going to be asked to pay for more. They didn't like it. They wanted to be, to work more hours and they wanted to be paid for that, paid more. Doesn't that show at least that as to Hills? Well, well, let me, let me answer that this way. They, they accepted the job around the 1st of May, but of course they're working at Waterford three. They know what's going on. So they accepted the job. Then they see for a month what's happening. And then they signed the letter on June the 4th. They've had a couple of days to see how they're being treated. And that's what leads to the letter.  It's what they were aware of while working for Wackenhut, admittedly a different employer, but under this, you know, I mean, energy was directing what they were doing at that time. So it's not. So you think this reflects only three days of learning at the, on the job because it says due to nuclear regulatory commitments, at times supervision will have to fill positions normally manned by hourly security officers. Supervisors will also be mandated to fulfill vacation requests, sudden illnesses and personal leave. And this is aggressive and demanding and so forth. I mean, they knew that going in. That's what this letter shows me. They knew. They didn't know it at the time of hire, but they learned it between the time of hire and the time they asked because there was 30 day gap there between when Scott Anders offered them the job and the time they started work. And so that's what, and another item I forgot to mention, he didn't tell them that they would be filling in prior at the time of the job offer. He didn't tell them they would be filling in for non-exempt security officers who were hourly and subject to union work. So I just don't. But there's another point there. If you think about it, energy is trying to say that the work week applies. And what we all understand that to mean is that, well, basically you're agreeing that you're going to accept this salary for however many hours that you work in a week, right? I mean, isn't that? And, but when they asked the energy representative, what does this mean to be hourly? He gives them an hourly pay. If you think about that, there's no way you can calculate an hourly pay. But that number is based on what? That was the number I asked you about earlier on the map. But where, what is that number based on? How many hours was that calculation based on? Forty hours. I thought you said it was a 72. He was telling them, no, he calculated what their salary was going to be internally. He and the human resources calculated it based on the upcoming anticipated 72 hours that they would be allowed to work maximum. Per week? Per week. Okay. Under the fatigue rules. But when they asked him, what's my salary? He takes 40 hours and does the division and that's a very different number. For example, if you take Douglas Luke, well, I think the, the average used was 69,000. And if you take that at 40 hours, that's, I don't know, around $30 an hour. But if you take it based on the fatigue rules, that's not 2,050 hours, 2,080 hours, that's more like 3,700 and something hours. So that's, that's how, how can they have a meeting of the human resources when he's giving them an hourly rate that is totally different from what he knows is expected of them? So what is the right rate for them to, like, if we were to remand, now we're going to have a trial, whatever, what is the right rate? Is it the 72 hour rate? Is it the 40 hour rate? Is it some other, is it minimum wage? Is it, what is it? You mean to take their salary and base it on how many hours? Well, I mean, I don't know if you were watching the last couple of images and I'm asking, I'm essentially asking that question. It's a different one than I asked before. You've now told me about three or four different ways of calculating the hourly rate. Which one's right? Well, now I'm telling you exactly what Mr. Anders told me he did. And what he did was very clear. Okay, but which one is correct? Which is the correct way to do it? I guess that's why we're, we need a trial. It's up to a jury to determine that. You don't have a thought on that? You're not going to offer any argument to the jury on that? Yeah, I mean, it's a factual decision. And what is your thought on that? My thought is, these guys thought they were working a 36 hour one week and a 48 hour the next week. And so that's what, 84 hours every two week pay period. That's what they were agreeing to. Okay. So two weeks of salary divided by 84 is the number you think should apply? Yes. Okay. Forty-two hours a week. And that salary should be used to come up with a compensation scheme and the overtime rate. Okay. All right. Thank you. You saved time for a bonus. Okay, for energy, is it Coke? Yes, sir. It sure is. Just a guess. Good guess. My maiden name was Williams. That was much easier. Coke is often wrong. My name is Amelia Coke. I'm here with Jennifer McNamara on behalf of Energy Operations. I disagree with the way Mr. Kater described how that initial salary was put together. They tried to look at what the people had been making at Wackenhut and come up with a salary that would be fair based on what they had been earning as hourly workers before. They brought them in-house as exempt because Entergy had existing security services. They were hiring them into an existing job that was treated as exempt and they were trying to get these people into the market-level salary and also keep them paid about as much as they were before for Wackenhut. So that's how they came up with the salary. The workload didn't really change. There were fatigue rules. Those didn't change around that time. The people were doing similar work at Wackenhut in terms of the level of work they had to do as when they came on board at Entergy. So you are right in the letter where they complained about the workload. It was because of what they had been experiencing prior to that time. It didn't suddenly change on June 1st when the transition occurred. They were just objecting to how they were going to be paid for it. It's evidence that they knew. At least Hills knew. At least Hills knew. That's exactly right. So the salary was meant to be, you know, an uptick on what their base pay had been, if you will, with Wackenhut and we think it was. But none of that really matters. What matters is, you know, we don't think Mr. Andrews deceived them or meant to or tried to. What matters is that there was a salary that was offered to them and they accepted it knowing that it was a salary and that they were not going to get overtime. That's not actually our case because that actually you didn't get summary judgment on. Our case is you have to win that it's a fluctuating work week and then you have to win this bonus offset and then as to these two people, which is all we have in front of us, then they don't have any damages because of the offset kind of overdoes or takes care of the liquidated damage, blah, blah, blah. So that's your case. So now we look at the fluctuating work week and the question Judge Smith phrased it well, I may come at it    Is this a fluctuating work week? Is this a fluctuating work week? Is this a fluctuating work week? Is the fact alone without any other evidence of a 36, then 48, then 36, then 48, if that's the only evidence we have, is that a fluctuating work week? I think so. And we've argued that it is, but that is not, in fact, what we have. But you keep citing to these depositions that don't say what you say they say. Well, they do. Like, for instance, Mr. Hills in the complaint letters was complaining about having to work extra shifts. Okay, I agree with that. But then the deposition that he made about having to work extra shifts. The deposition stuff just doesn't say, you know, it doesn't say that, oh, I knew I was going to be paying, working more. It says, like, for example, at page with Luke, page 25, I don't have a, oh, I can't read the record. 3434. When you apply for the job that you understand that you no longer be making hourly, you get an annual salary. I do understand that. But we were shorthanded.   We took the job with the understanding that in getting these positions, there would be an annual salary. There would be no more working overtime. That was supposed to do away with that. That would have put us working the normal 40 hour work week without any additional time. That doesn't sound like an understanding that, oh, I'm going to sometimes fill in for someone. We believe it does. When you take his testimony in totality, that he knew there was, that they were shorthanded. He knew because he was an officer, he was working there.  He knew the supervisors were working extra shifts. So when he took the job with the understanding that they were shorthanded, he took the job. He knew there were extra shifts. He knew he was going to have to work them. He knew they were trying to hire more people, including him, to alleviate that. Right. And if I may just finish this thought. So I think they knew they were going to have to work extra shifts. They knew they worked more than the base schedule. It was more than they expected. And the law in this circuit is, under ransom, is clear  I don't think she loved it, but she held it. That working extra shifts was not an option. That working more than you thought you were going to have to does not take you out of the fluctuating work week calculation. If you knew your salary was all you were going to get, no matter how much you worked, and that your schedule was going to vary, which they clearly did, then that's all that's required. Yeah, but I mean, OK, so maybe there's a different part of the record than the one you keep citing to. Because what you keep citing to is basically this stuff, where they go, well, we thought  with the 36 and 48. And again, if that's the case, we're going to say, OK, if that's enough to be fluctuating, that's enough. But if it's not, I'm not sure you have the plus-plus. Well, let me go back to the 36-48 for a minute. They worked three shifts one week and four shifts the next as sort of the minimum, usually, although there was some variation to that at times. Those shifts weren't all just 12 hours. So it's not exactly 36-48. In other words, there's some pre-shift work and some post-shift work. So even within the 36-48, you know, they were supervisors. They weren't just clocking in, clocking out. They were there, you know, more than 36-48, even on that base shift. And again, if you look at their testimony, what they're complaining about is we had to work more than we thought. We knew we were going to get a salary. We knew we weren't going to get overtime anymore. We knew we were going to have to work extra sometimes. It was just more than we thought, more than we wanted, more than, you know, we felt like doing. You know, and that does not take them out of the fluctuating workweek realm under this Court's cases, such as ransom. But I mean, unless, okay, so let's assume, arguendo, that we do not think that a 36-48 by itself is enough. Let's just assume that, arguendo, for purposes of this analysis. I'm still having trouble understanding where you can point me to where they agreed, yeah, and we'll do these additional shifts and whatever. Putting aside the letter Hilton, let's talk about the little signs. Let's talk about Luke. Because this is the testimony I'll keep coming back to. I'm not seeing that. He's saying he thought, let's say they needed three more people. Now they've hired the three more people. He thinks, therefore, there won't be any more overtime. How is that showing that he knew there would be overtime? I think what he said was when he was hired, he knew they were going to completely alleviate the problem, but I think he knew, starting out, he was going to have to work more than the base shifts. I think that's what his saying, we were shorthanded. Can I just say this, too? Ransom suggests that you can look at the testimony of all the plaintiffs as a whole and say the plaintiffs as a group had an understanding of their job, that they had a salary, that their work time was going to vary. We thought the judge could have granted summary judgment on everyone just on account of the collective weight of the testimony on this point, but she didn't. She poured over every bit of testimony from every plaintiff and found that each one understood that they were going to have to work more than the basic schedule. She said that at the hearing. Like I said, I don't think she liked that very much. She might have thought it was excessive, but she said that in the oral argument. But that's what she didn't grant summary judgment on. She found a fact issue on what Anders told them. No, no, she did. I don't mean to interrupt you, but on 16 plaintiffs, even Luke, even some who said they didn't understand it, she poured over their testimony and said, I think they really did. They might not want to admit it now, but I think they really did. She looked at all the deposition and said, well, that's 3648 by itself. That wasn't this extra stuff. No, I mean, the evidence of more than 3648 was in the record also. We provided a chart to the judge that had, you know, that mentioned all of that. And I'm not sure, you know, perhaps the opinion could have been a little clearer about it, but if you look at what happened at the oral argument, that was definitely discussed. And that's what they were really mad about, you know, is that they were, you know, starting out in the complaint letter. They could see that it was going to continue to be what it had been. You know, everybody out there had to work a lot and pretty hard, and they were paid pretty handsomely for that, I might add. And she, and they just, you know, became tired of it over  How do you answer, well, they seem to be tired immediately. They wrote this letter. Well, that was basically, I mean, they didn't write that letter on the afternoon of June 1st, the day they started. You know, that was, you know, they knew what was happening because they were there. They had been working there for years. How do you answer his point about that they were told that even though the guy calculated based on the 72 hours, they were told you'll be essentially receiving, you know, $30 an hour. Why isn't that the number we should use for assessing all of this? Well, because the choices really are two. You know, there's the fluctuating workweek way of doing it where you look at every week's rate of pay or the time and a half way of doing it if the fluctuating workweek doesn't apply. And so all what he's talking about is, and as I say, I don't disagree with, I do disagree with the way Mr. Cater described it. I think what Mr. Andrews was trying to do was come up with a salary and explain to them how he came up with it because they were being changed from hourly to salaried. But the way you calculate overtime where you've got agreement on a salary and a fluctuating schedule is the fluctuating workweek method. What you're talking about is maybe some other hybrid method that this court in the party city case told Matt Strait there you couldn't do. You know, you couldn't come up with some sort of mechanism for. No, I'm simply saying why wouldn't you enforce the deal you cut, which was the $30 an hour, and then if there's overtime you multiply, that's $45 an hour. Because that wasn't really the deal. The deal was a salary for hours that would vary. What do you want the court to do, this court? Affirm Judge Malazzo in all respects, I think the court over each of the plaintiffs granted summary judgment as to 16, including these two, on the fluctuating workweek issue. We think that was exactly  And then the offset is another question altogether, really. I think, you know, Mr. Caters. Well, if you affirm her in all respect as you suggest, what do the employees? These guys? Well, these two, nothing. Because their bonuses outstrip what they could recover under the fluctuating workweek method. And frankly, that's kind of a measure of how generous the bonuses were. And that's why we're here, because they don't have a justiciable claim, I have a hard time with that word, and therefore there's no subject matter jurisdiction over their claims. So if you affirm the judge in all respects, these two gentlemen's claims are still alive. These were Well, what sum of money would they be due before the offset? What sum of money would they be due before the offset? I don't know that right off the top of my head. How would you calculate it? With the fluctuating workweek? With the fluctuating workweek? Well, just take one worker. How would you calculate it? You look at the hours worked per week and apply that to their salary, come up with an hourly rate, and then for the hours over 40, you pay them half of that, because the fluctuating workweek says you've already been paid straight time for every hour, no matter how many there were. So for each of these people, we've done that, and I'm sorry, I just don't have it. It's in the charts in the briefs what it would be. What if we disagree, we think it's not a fluctuating workweek? Then they would have a live claim. Then what? Then if they win on classification, which let's not forget that hasn't really been ruled upon yet, if they win on classification, then they would get just sort of a normal  to... Which would be what here? It would be whatever their salary is, whatever their salary is per week, divided by 40 times however many hours they worked that week. Then it would vary. There's some weeks where they don't have any, some weeks where they have some, and some with a lot. So it's the multiplier changes depending on... Let me be sure I understand. So if you lose on the question of fluctuating workweek, and so that these two benefit from the time and a half, then what  time and a half rule, and then you deduct their bonuses, they still come out ahead. They still would have some recovery. Assuming an adverse ruling for you on the question. I think they would, yes, sir. Because I didn't see that math. And the charts that you're talking about are on page four of the district court's opinion on, so R4550. But I didn't see that y'all did the math on the what if, it's not the fluctuating workweek. We didn't in that brief. So we couldn't affirm on that because we don't have it. No, no, that's not in the record, because the judge ruled that the fluctuating workweek should apply, and then we went back to her and said, well, if you've got the fluctuating workweek and the setoff, these people's claims are less than zero, and therefore they don't have a justiciable claim and no subject matter jurisdiction. So, and I might add that, you know, she looked at the testimony of a lot of different people. Many were quite forthcoming about their knowledge, some less so, but, you know, like one of the plaintiffs' testimony that the plaintiffs cited was Mr. LaBeouf, and he said he understood he would be receiving a salary, he wasn't expecting any overtime, and he knew he would be required to work the 36, 48-hour schedule, plus whatever overtime had to come in for. So I think that's more, that's typical of what the plaintiffs said, the complaint letter kind of. Let me ask you a question. Once we, once you take a worker and you classify them as a manager, so you, and we're going to pay you a salary. Mm-hmm. You know, we have a lot of situations where the manager is doing a repetitive work of the widgets, but nonetheless, except that they are a manager, and he agrees to a salary of $50,000 a year. Mm-hmm. Now, what constraints does the Fair Labor Standards Act place on the number of hours that worker makes? None. None. Now, you know, we might not like that, but. If these people agree to be, to work as managers, and there's no contest, but that they are managers, and hence they could agree to whatever salary, then what you're saying is that if a labor law doesn't constrain here, it's really just what the agreement between the parties were. Yes, sir. That's exactly right. So, your agreement of your, so that this fixity between the, this supposed clarity between the fixed and the pestilating work week and so forth is an agreement of parties that is incorporating some external standard. Now, take it from somewhere, from labor law. Where does that come from? That's just the way. Or is it purely a matter of what they agreed to? That's just what the, well, that's the way Intergy runs its security shifts. So that, because they are supervising. I'm making myself clear. Oh. If this isn't a fight between them, or a disagreement about what my contract says, and the Fair Labor Act doesn't have any role to play in it, I'm not sure why we're here. No. Well, you're telling me that there's no constraint here, except with regard to the question of management, and that's not dispute. Right. Well, and. No, I guess I'm confused. If we, well, if these people ultimately win, and are proven to be classified incorrectly. I don't know. Winning begs the question. My question is, what is it we're talking about? Are you talking about a breach of contract suit? Are you talking about a misapplication of federal law? That's pretty basic. Well, they're claiming to be, they're claiming that they're misclassified under the FLSA, and if. Whoa, whoa, whoa. Go back to my question. I asked you the question of whether or not, if they are a salaried worker. Yes. I'm a manager. Yes. I'm hired. You're going to be the plant manager. I'm going to pay you $100,000 a year. Then I can work, I can probably work as many hours I want to. Right? Right. And you said that's without regard to the fair labor state. Right. That's pure. Well, they, why does that end it? You're saying, but now you're saying there is some other constraint from the labor law. No, I'm just saying that. No, sir. I'm not. I'm just saying that the fluctuating work week is all just about how do you pay people if they win on the classification issue. If they are proven to be outside the realm of what you're postulating, that is, a manager in a company. But the classification issue is purely a question of contract. The interpretation of their contract. Well, it's a matter of whether       It's not before us. It's not before us. It's not before us. It's not before us. It's not before us. It's not before us. It's not before us. It's not. That's still before. So our, our, our, our task here is to assume, for purposes of deciding this, that they're not exempt. Right. Yes, sir. If they, if they succeed on that question, how do you calculate their overtime via the fluctuating work week or otherwise? And can we offset the bonuses? Well, what it's worth, this isn't a very good way to bring this up.     It's kind of, it's a little bit of a weird way to say it. It's a little bit of a weird way to say it. It's a little bit of a weird way to say it. It's a rough way to do an appeal, but I know you, you play the hand you're dealt to some degree, but I mean, it's, it's. And if I may just say about the, about the offset, we haven't gotten to talk about that very much. We think that that offset is right in line with the Fifth Circuit cases, which admittedly, starting with Heard, have some disinclination to permit offsets. But then we come to Gagnon,    according to your definition in the first round, which is that, you know, there's, there's, there's some, there's some disinclination to permit offsets. And then there's the latest argument we had today from 2010, which said offsets can be appropriate where the amounts paid are inappropriate. And we think that's what we find here because the, the, if these people were classified as management, that's the only reason they got the bonuses. If they are termed to be     they get. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Okay. Mr. Kater, you save time for both. I would like for you to think about when you're considering this case, how these employees could not be totally confused when he told them that they were going to be paid or how their salary would break down in an hourly way if you're considering applying the fluctuating work week. Because you can't do it. It doesn't work. I mean, because it's a moving target. The hours worked are different every week. He knew that was going to be the case. He knew that he had calculated it based on the way he himself testified that he worked over 70 hours a week that year. And he knew they were going to have to because they just didn't have the manpower. But they all said they knew they were getting a salary. They did know that. They did know they were getting a salary. That's right. By its nature, you're not punching a clock when you get a salary. So if I take a job as a lawyer, I'm going to get paid $200,000 a year. And I figure, well, I'll probably work about 2,000 hours. That's about $100 an hour. But I know there might be weeks that I'm working night and day. And there might be weeks where things are slow. I don't have any business. And I'm just kind of sitting there, you know, reading CLE papers. But they're not punching a clock. They're punching a clock every day. There's an absolute record of all their hours. And he's telling them... They're saying that is contrary to the salary point. And therefore, they didn't understand they were getting a salary? Well, I mean, I think it certainly is a jury issue. I mean, what we're here today about is whether summary judgment was appropriate. These cases are so fact intensive that it's almost impossible to do otherwise.     the math on whether somebody's getting a salary or not. I mean, I don't know. I don't know. I don't know. I don't know. I don't know. I mean, ever.      I don't know. It's not necessarily true. But I do know what your guys claim they're owed. It's just weird to me. Well, I mean, we haven't gotten beyond... We haven't tried the case. We haven't gotten to classification. We haven't... I mean, I can tell you based on... I don't know the precise number, but based on his calculations, he's expecting 3700 hours of work a year. And they're expecting 2080 hours of work a year. And that's a big difference. And that's why we're here. They were just working them abusively. The overtime was incredible. And I'm not arguing that it was more than they expected. They expected... I mean, Douglas Luke couldn't be more clear. He said, I expected to work 36 hours one week, 48 the next.  the job. And it's in the record that when they didn't live up to their end of the bargain, he quit. He took a job and he quit. He quit. He quit. He took a job making $15 an hour, and with the overtime he made at $15 an hour, it was more than his salary. Plus bonus. Sorry? Plus bonus. Yeah. That's what he said. Because his bonus was pretty big. Yeah. His was, I think, about $20,000. Yeah, but he worked fewer. Yeah, he did. And I don't know that you can... You're claiming that these two are not exempt, right? Correct. You're claiming that they're completely... That's absolutely correct. And you're going to base that on the usual tests about whether they have supervisory responsibilities and all those sorts of things. Ultimately, if we get to trial, we'll prove that. And that they're first responders. These are hourly workers. You claim these are hourly workers, not sub. Right. Exactly. Essentially. Right. And I don't think you can impute... You know, they were going... I don't think you can impute all the knowledge that they had from Wackenhut to the staff.      role, and they're going to be a lot of energy. Because they're going to work for a new employer, with new personnel who are in charge, and they don't know what the staffing is going to be. They believe that the employer is going to take care of that. But that was not in the works, and it wasn't in the plan. The employer said,        did it. And we did it. And we did it. And we did it. And we did it. And we did it. And we did it.             did it. And we did it. And we did it. We announced it, yes. And it was very good. Elected       it.      by our constituents. And it was very good. And we did it. Thank you. Thank you. We did